UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW
YORK

-----------------------------------------------------------------X
                                                    :
                                                    :
In re:                                              :     Chapter 11
TERRESTAR CORPORATION, et al.                       :     Case No. 11-10612 (SHL)
Debtors,                                            :      Jointly Administered
                                                          Adv. Pro. No. 13-01334 (SHL)

-------------------------------------------------
                                                    :
ALDO ISMAEL PEREZ,                                  :
                                                    :
        (*Pro Se*) Plaintiff                        :
                                                    :
        -v-                                         :
                                                    :
TERRESTAR CORPORATION, et al.                       :
                                                    :
        Defendant                                   :
                                                    :
-----------------------------------------------------------------X



RECEIVED
OCT 1 3 2015
U.S. BANKRUPTCY COURT
SO DIST OF NEW YORK

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
RECONSIDERATION OF MEMORANDUM DECISION AND ORDER DISMISSING
THE DEBTORS' MOTION TO
DISMISS THE SECOND AMENDED COMPLAINT (ECF No. 18-30) (the "Complaint")
OF THE PLAINTIFF, ALDO ISMAEL PEREZ, IN THE ABOVE CAPTIONED
ADVERSARY PROCEEDING. PURSUANT TO SECTION 1144 OF THE BANKRUPTCY
CODE, THE COMPLAINT SEEKS TO REVOKE THE COURT'S ORDER
CONFIRMING THE DEBTORS' PLAN OF REORGANIZATION ON THE BASIS THAT
THE ORDER WAS PROCURED BY FRAUD.  THE OFFICERS' OF THIS COURT ARE
PLAYING A REVISED LEGAL GAME WITH THEIR OWN CREATED RULES AND
THIS IS FRAUD UPON THE COURT.**

Plaintiff, ALDO ISMAEL PEREZ, being represented *Pro Se*, and pursuant to Local Civil

Rule 6.3, hereby submits the following memorandum in support of Plaintiff's Motion for

Reconsideration of this Court's September 29, 2015 Memorandum Decision and Order dismissing

the Second Amended Complaint, which resulted in the September 29, 2015 Judgment dismissing

this Adversary Proceeding. Plaintiff respectfully requests that this Court reconsider its Order as it

appears that this Court overlooked controlling decisions, facts or data, which, if considered,

would alter the conclusions reached by this Court.  In support hereof, Plaintiff states as follows:

I.    **Summary of Issues and Facts Which this Court May Have Overlooked**

The primary basis for dismissal of this proceeding was a finding that the Second Amended Complaint is equitably moot. In making its findings, this Court, respectfully, appears to have overlooked the following facts and/or information:

1.    The 1.4 GHz Spectrum License was not the only asset or recoverable asset at the time of the premature/improper confirmation of TSC's[1] Third Amended Joint Plan;

2.    The transfer of the 1.6 GHz Spectrum License to an insider of TSC within one year of TSC's bankruptcy was a potential fraudulent/insider transaction whose recovery value was not investigated, was not provided for in the Third Amended Joint Plan and was otherwise completely overlooked;

3.    The transfer of the 2.0 GHz Spectrum License to an insider of TSC was a potential fraudulent/insider transaction whose recovery value was not investigated, was not provided for in the Third Amended Joint Plan and was otherwise completely overlooked;

4.    The materiality of Jefferies & Company's valuation of the 1.4 GHz Spectrum License and its far-reaching impact on the ramifications to the power-control structure of TSC was not given its proper weight;

5.    Plaintiff was not afforded a meaningful opportunity to provide information as to the proper value of TSC's assets or to cross-examine TSC's valuation expert (Mr. Zelin) who relied upon the eleventh-hour report of RKF Engineering;

6.    TSC misrepresented its "residence" and or "Principal Place of Business" to Fraudulently Establish Jurisdiction for Venue in the Southern District Court of New York.

The Plaintiff (Aldo I. Perez) contends that venue in this district never was proper, for failure to satisfy the requirements of the relevant statute, 28 U.S.C. § 1408.

Under these circumstances, the Plaintiff (Aldo I. Perez) contends, that the Confirmation of the Plan was procured because of FRAUD ON THE COURT.

**The statutory requirements for venue in this district were not satisfied.**

To the extent that the principal places of business of the other Debtors are relevant (though the Court does not believe that they are), they are likewise in Virginia, or at least in places other than New York. None of the Debtors is organized under the laws of New York. The Debtors are Delaware corporations.

The "nerve center" of the entire corporate enterprise is in Reston, Virginia—where "Terrestar Corporation and Terrestar Networks" (without being more specific as to what individual corporations were encompassed under that appellation).

The Bankruptcy venue statute, as codified in 28 U.S.C. 1408, establishes a debtor's domicile, residence, principal place of business, or the location of the principal assets of a debtor as the criterion for determining the proper venue of a bankruptcy case. Alternatively, under subsection (2) of the statute, venue can be established in a district where there is a pending chapter 11 case involving a debtor's affiliate, general partner or partnership.

TSC's business residency when it filed for Chapter 11 bankruptcy relief was in Delaware where it was incorporated and its residence and principal place of business was in Reston, Virginia. TSC's principal assets were not located in the Southern District of New York.

On December 9, 2008, TSC utilized Wyoming Corporate Services, Inc. located in Cheyenne, Wyoming and created Worldwide Imaging, Inc., a Wyoming corporation. As the events set forth below establish, this Wyoming corporation which later on was transformed into Terrestar New York, Inc., through a name change and implied change of its principal place of business on March 10, 2010, and March 17, 2010, was always intended to be a shell corporation to be utilized to fraudulently create venue/jurisdiction in the Southern District of New York.

The slipped reference to "Westchester" in its original incorporation filing in Wyoming, an obvious reference to "Westchester County" in New York, signals TSC's apparent intent back in 2008, to use the corporation in New York.

The Wyoming corporation, Worldwide Imaging, Inc., was formed on December 9, 2008, with the authority to only issue 200 shares and the election also was made to have the shares issued with "no par" value. The minimal issuance of shares at no par value shows TSC's intent to maintain this Wyoming corporation as a "shell company". Worldwide Imaging, Inc., never conducted any operations or business in Wyoming, having no officers, directors, shareholders, or employee. ( Exh. A )

On March 10, 2010, TSC's Chief Executive Officer and In-House lawyer, Douglas I. Brandon, acting as "Sole Incorporator", for Worldwide Imaging, Inc., because the corporation had no officers, directors, shareholders, or subscribers to stock to the corporation, filed a certificate of amendment to the certificate of incorporation to change the name of the corporation to Terrestar New York, Inc., and to change its location to New York. The address used for service of process was TSC's principal place of business in Reston, Virginia.

Just seven days later, on March 17, 2010, TSC's Chief Executive Officer and In-House lawyer, this time acting as Sole Director (reaffirming again that the corporation had no officers, shareholders of record, or subscribers for shares) filed another certificate of amendment to the certificate of incorporation to reflect 545

Eighth Avenue, Suite 401, New York, NY 10018 as the address of Terrestar New York, Inc.

Upon post-confirmation investigation, it was discovered that this New York address, which was misrepresented to this Court as being the address for TSC and TerreStar New York, Inc. was actually a call center known as 1800Weanswer and not the address or principal place of business of TSC or of TerreStar New York, Inc.

Upon further post-confirmation investigation, it was also determined that the call center had been occupying the misrepresented address for TSC and TerreStar New York, Inc., for over 20 years and its employees had never heard of TSC or TerreStar New York, Inc.

Upon further post-confirmation investigation, it was determined that TerreStar New York, Inc., neither before nor at the time of TSC's Chapter 11 bankruptcy filing (or at any time thereafter), has not had any officers, directors, employees or shareholders.

Whether as "Worldwide Imaging, Inc.", or "Terrestar New York, Inc.", the corporation has never had any operations or conducted any business.

TerreStar New York, Inc. f/k/a Worldwide Imaging, Inc. was formed to be a shell company which, at the time of TSC's bankruptcy filing on February 16, 2011, had only one passive asset, a $5,000 deposit funded by TSC in a Suntrust account in Reston, Virginia just before the Chapter 11 bankruptcy filings.

This shell company, having no legitimate connection to New York, however, was utilized for the sole purpose of fraudulently establishing the venue/jurisdiction of TSC and TSC's subsidiaries' (all Delaware entities) bankruptcy cases in the Southern District of New York.

As referenced by the following marked as (EXH B)

- T3 filed with the SEC confirms No officers, NO directors, employees or shareholders, it also confirms the address of 1-800WEANSWER.

- The Corporate Bylaws Submitted to the SEC are a complete contradiction of the submission of the T3.

- The RW as a formal method of a news announcement to inform all interested parties and shareholders that there will be no sew shares issued in another words "going private".

## Definition of Shell Company (as defined in §230.405)

The new rules define a "shell company" as any company that files periodic reports under the Exchange Act that has

- no or nominal operations and either
○ no or nominal assets or
○ assets consisting solely of any amount of cash and cash equivalents and nominal other assets.

The SEC did not further define the term "nominal" and specifically rejected any quantitative threshold, concluding that a specific threshold would provide an easy way to circumvent the definition of "shell company" and avoid application of the new rules. The adopting release suggests that an evaluation of the term "nominal" encompasses more than merely a quantitative inquiry. For example, the SEC described a scenario in which a promoter or affiliate of a shell company, to avoid application of the "blank check company" rules, places assets or operations into a shell and, after completing a business combination, transfers the assets or operations back out of the shell. The SEC would consider such assets or operations to be "nominal" for the purpose of the definition of a shell company. The definition of "shell company" excludes companies that are "business combination related shell companies" used to structure corporate transactions. These consist of:

- a shell company formed by an entity that is not a shell company solely for the purpose of changing that entity's domicile within the United States; and
- a shell company formed by an entity that is not a shell company solely for the purpose of completing a business combination transaction among one or more entities, none of which is a shell company.

TSC committed "FRAUD ON THE COURT" for improperly seeking refuge in the Southern District of New York, the law presumes and common sense dictates that only a fraudulent and strategic purpose was intended for this fabricated venue.

**But evidently, this is The OFFICERS of this court playing a revised legal game with their own created rules to find that Terrestar New York does business in the state of New York.**

## SUPPRESSION OF TRUTH AND FALSE INFORMATION

Fraud includes the suppression of the truth, as well as the presentation of false information (In re Witt (1191) 145 Ill.2d 380, 583 N.E. 2d 526, 531, 164 Ill. Dec. 610). See also In re Frederick Edward Strufe, Disciplinary case no. 93 SH 100,

"Where the Court stated that fraud has been broadly defined as anything calculated to deceive. It should be noted that the definition of fraud applies to everything an attorney may be engaged in, whether in court, or in his office."

**It is well established in law that any attempt by an attorney, to deceive is considered fraud, and when the attempt to deceive occurs in a judicial proceeding, it is "fraud upon the Court."**

**The OFFICERS of this court are playing a revised legal game with their own created rules and THIS is FRAUD UPON THE COURT.**

Fraud Upon the Court is where the Judge (who is Not the "Court") does NOT support or uphold the Judicial Machinery of the Court. The Court is an unbiased, but methodical "creature" which is governed by the Rule of Law…that is, the Rules of Civil Procedure, The Rules of Criminal Procedure and the Rules of  Evidence, all of which is overseen by Constitutional law.  The Court can ONLY be Effective, fair and "just" if it is allowed to function as the laws proscribe.

The sad fact is that this court has officers of the court who are violating their oath of office and are not properly following these rules, as most of the officers of this court do NOT as well, and are usually grossly ignorant of the rules.

## A.  Who is an "officer of the court?"

A judge is an officer of the court, as well as are all attorneys. A state judge is
a state judicial officer, paid by the State to act impartially and lawfully. A
federal judge is a federal judicial officer, paid by the federal government to
act impartially and lawfully. State and federal attorneys fall into the same
general category and must meet the same requirements. *A judge is not the
court.* People v. Zajic, 88 Ill.App.3d 477, 410 N.E.2d 626 (1980).

## A.  What is "fraud on the court"?

Whenever any officer of the court commits fraud during a proceeding in the
court, he/she is engaged in "fraud upon the court". In Bulloch v. United
States, 763 F.2d 1115, 1121 (10th Cir. 1985), the court stated "Fraud upon
the court is fraud which is directed to the judicial machinery itself and is not
fraud between the parties or fraudulent documents, false statements or
perjury. ... It is where the court or a member is corrupted or influenced or
influence is attempted or where the judge has not performed his judicial
function --- thus where the impartial functions of the court have been
directly corrupted." "Fraud upon the court" has been defined by the 7th
Circuit Court of Second Amended Complaint of the Plaintiff Aldo Ismael
Perezs to "embrace that species of fraud which does, or attempts to, defile
the court itself, or is a fraud perpetrated by officers of the court so that the
judicial machinery cannot perform in the usual manner its impartial task of
adjudging cases that are presented for adjudication." Kenner v. C.I.R., 387
F.3d 689 (1968); 7 Moore's Federal Practice, 2d ed., p. 512, ¶ 60.23. The 7th
Circuit further stated "a decision produced by fraud upon the court is not in
essence a decision at all, and never becomes final."

## C. What effect does an act of "fraud upon the court" have upon the court proceeding?

"Fraud upon the court" makes void the orders and judgments of that court. It
is also clear and well-settled Illinois law that any attempt to commit "fraud
upon the court" vitiates the entire proceeding. The People of the State of

Illinois v. Fred E. Sterling, 357 Ill. 354; 192 N.E. 229 (1934) ("The maxim
that fraud vitiates every transaction into which it enters applies to judgments
as well as to contracts and other transactions."); Allen F. Moore v. Stanley F.
Sievers, 336 Ill. 316; 168 N.E. 259  (1929) ("The maxim that fraud vitiates
every transaction into which it enters ..."); In re Village of Willowbrook, 37
Ill.App.2d 393 (1962) ("It is axiomatic that fraud vitiates everything.");
Dunham v. Dunham, 57 Ill.App. 475 (1894), affirmed 162 Ill. 589 (1896);
Skelly Oil Co. v. Universal Oil Products Co., 338 Ill.App. 79, 86 N.E.2d
875, 883-4 (1949); Thomas Stasel v. The American Home Security
Corporation, 362 Ill. 350; 199 N.E. 798 (1935).

Under Illinois and Federal law, when any officer of the court has committed
"fraud upon the court", the orders and judgment of that court are void, of no
legal force or effect.

### D. What causes the "Disqualification of Judges?"

Federal law requires the automatic disqualification of a Federal judge under
certain circumstances. In 1994, the U.S. Supreme Court held that
"Disqualification is required if an objective observer would entertain
reasonable questions about the judge's impartiality. If a judge's attitude or
state of mind leads a detached observer to conclude that a fair and impartial
hearing is unlikely, the judge must be disqualified." [Emphasis added].
Liteky v. U.S., 114 S.Ct. 1147, 1162 (1994). Courts have repeatedly held
that positive proof of the partiality of a judge is not a requirement, only the
appearance of partiality. Liljeberg v. Health Services Acquisition Corp., 486
U.S. 847, 108 S.Ct. 2194 (1988) (what matters is not the reality of bias or
prejudice but its appearance); United States v. Balistrieri, 779 F.2d 1191 (7th
Cir. 1985) (Section 455(a) "is directed against the appearance of partiality,
whether or not the judge is actually biased.") ("Section 455(a) of the Judicial
Code, 28 U.S.C. §455(a), is not intended to protect litigants from actual bias
in their judge but rather to promote public confidence in the impartiality of
the judicial process."). That Court also stated that Section 455(a) "requires a
judge to recuse himself in any proceeding in which her impartiality might
reasonably be questioned." Taylor v. O'Grady, 888 F.2d 1189 (7th Cir.
1989). In Pfizer Inc. v. Lord, 456 F.2d 532 (8th Cir. 1972), the Court stated
that "It is important that the litigant not only actually receive justice, but that

he believes that he has received justice." The Supreme Court has ruled and
has reaffirmed the principle that "justice must satisfy the appearance of
justice", Levine v. United States, 362 U.S. 610, 80 S.Ct. 1038 (1960), citing
Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13 (1954).

A judge receiving a bribe from an interested party over which he is
presiding, does not give the appearance of justice. "Recusal under Section
455 is self-executing; a party need not file affidavits in support of recusal
and the judge is obligated to recuse herself sua sponte under the stated
circumstances. " Taylor v. O'Grady, 888 F.2d 1189 (7th Cir. 1989). Further,
the judge has a legal duty to disqualify himself even if there is no motion
asking for his disqualification. The Seventh Circuit Court of Second
Amended Complaint of the Plaintiff Aldo Ismael Perezs further stated that
"We think that this language [455(a)] imposes a duty on the judge to act sua
sponte, even if no motion or affidavit is filed." Balistrieri, at 1202.

Judges do not have discretion not to disqualify themselves. By law, they are
bound to follow the law. Should a judge not disqualify himself as required
by law, then the judge has given another example of his "appearance of
partiality" which, possibly, further disqualifies the judge. Should another
judge not accept the disqualification of the judge, then the second judge has
evidenced an "appearance of partiality" and has possibly disqualified
himself/herself. None of the orders issued by any judge who has been
disqualified by law would appear to be valid It would appear that they are
void as a matter of law, and are of no legal force or effect. Should a judge
not disqualify himself, then the judge is violation of the Due Process Clause
of the U.S. Constitution. United States v. Sciuto, 521 F.2d 842, 845 (7th Cir.
1996) ("The right to a tribunal free from bias or prejudice is based, not on
section 144, but on the Due Process Clause.").

Should a judge issue any order after he has been disqualified by law,

**and if the party has been denied of any of his / her property, then the
judge may have been engaged in the Federal Crime of "interference
with interstate commerce". The judge has acted in the judge's personal
capacity and not in the judge's judicial capacity.**

It has been said that this judge, acting in this manner, has no more lawful authority than someone's next-door neighbor (provided that he is not a judge). However, some judges may not follow the law. If you were a non-represented litigant, and should the court not follow the law as to non-represented litigants, then the judge has expressed an "appearance of partiality" and, under the law, it would seem that he/she has disqualified him/herself.

However, since not all judges keep up to date in the law, and since not all judges follow the law, it is possible that a judge may not know the ruling of the U.S. Supreme Court and the other courts on this subject. Notice that it states "disqualification is required" and that a judge "must be disqualified" under certain circumstances. The Supreme Court has also held that if a judge wars against the Constitution, or if he acts without jurisdiction, he has engaged in treason to the Constitution. If a judge acts after he has been automatically disqualified by law, then he is acting without jurisdiction, and that suggest that he is then engaging in criminal acts of treason, and may be engaged in extortion and the interference with interstate commerce. Courts have repeatedly ruled that judges have no immunity for their criminal acts. Since both treason and the interference with interstate commerce are criminal acts, no judge has immunity to engage in such acts.

This Court applied the *Chateaugay* factors to find that this Second Amended Complaint of the Plaintiff Aldo Ismael Perez is equitably moot. Respectfully, however, it appears that the underlying purpose behind the equitable mootness doctrine -- which is to protect innocent third parties who are affected by substantial consummation of the plan and who rely upon the finality of the plan -- was not given its proper weight.

## II. Application of the *Chateaugay* Factors
As set forth in previous Plaintiff/Plaintiff's briefs, this bankruptcy case was the result of a carefully orchestrated scheme by the three Preferred Series A and Series B shareholders of TSC to seize control of TSC, eliminate the common shareholders of this publically-traded company (like Plaintiff) and redistribute all of the common shares -- and, thus, all of the ownership/equity interest in TSC -- to the preferred shareholders; effectively wiping out the ownership/equity interests of the common shareholders in

TSC. In the end, these three Preferred Series A and Series B shareholders (or their successors-in-interest) and/or other insiders or control parties (including insiders of these Preferred Series A and Series B shareholders) now have complete ownership of three valuable assets which recently belonged to TSC or TSC's subsidiary, TSN: the 1.4 GHz Spectrum License, the 1.6 GHz Spectrum License and the 2.0 GHz Spectrum License.

Define **"INNOCENT THIRD PARTIES"**.

First, as argued by Plaintiff by having filed two Plaintiff Briefs, in addition to the Second Amended Complaint for Revocation of the Confirmation of the Plan 1144 and the scrutiny of TSC's 'substantial consummation evidence' reveals that there were no innocent, arms-length third parties who were affected by the post-confirmation events and transactions. Rather, the transactions were only by and between TSC's insiders and former preferred shareholders taking on differing roles in order to carry out their plan of owning TSC's assets and eliminating the ownership interests of TSC's common shareholders. Additionally, as argued by Plaintiff in his Reply Briefs, the only parties potentially affected by this motion, or the unwinding of any of the post-confirmation transactions, also are not innocent third parties, but are the very same parties who controlled this Bankruptcy proceeding from its inception. Likewise, these are the only parties who benefitted from the Third Amended Joint Plan and who were the recipients of the various insider transactions which should have been investigated.

Plaintiff submits that application of the doctrine is not meaningful without consideration of its underlying purpose: to protect innocent third-parties. *See In re E-II Holdings, Inc.*, 1995 WL 387650 (S.D.N.Y. 1995) (substantial consummation of the plan and the equitable mootness doctrine required dismissal of Second Amended Complaint of the Plaintiff Aldo Ismael Perezs and motions where the Second Amended Complaint of the Plaintiff Aldo Ismael Perezs and motions would require the unraveling of intricate transactions between the debtor and third parties who relied upon the finality of the Plan). *See also In re Centrix Financial, LLC*, 394 Fed.Appx 485, 2010 WL 3490245 (10th Cir. 2010).

**There aren't any INNOCENT THIRD-PARTIES**


As evidenced by Docket 822-11-10612 Letter from Patricia Madonna and referenced on the following 3 pages.

The result of this information being provided to the Court must have hit a nerve, although it did not unscramble the egg the end result was someone now wearing the egg on their face. Within 10 days of this letter being submitted to the court, the Public Access to the Terrestar Corporation Bankruptcy Proceedings being maintained through the GardenCity Group was removed. Unless you have/had access to a PACER account you can no longer view any proceedings.

11-10612-shl Doc 822 Filed 12/05/14 Entered 12/05/14 15:38:46 Main Document
Pg 1 of 3

Patricia Madonna
166 South 2nd Street
Frackville, PA 17931


United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004


November 19, 2014


Attn: Honorable Sean H. Lane
RE:   TerreStar Corporation, etal. Case No. 11-10612 (SHL

To The Honorable Sean H. Lane:

Your Honor, unfortunately, due to health reasons I was unable to appear at the hearing on October 29, 2014. However, because of access to Pacer I am able to keep myself well informed of the proceedings that have and continue to occur.   Including the latest filings.


Your Honor, victimized common shareholders, such as myself, firmly believe that this entire bankruptcy, without your Honors' knowledge, was controlled by the three preferred shareholders Sola, Ltd., Highland capital Management, West Face Opportunities, and their affiliated or subsidiary companies In one way or another.

Concealed from Your Honor, was and is the fact, that directly or indirectly, there has always been a substantial connection between these preferred shareholders and the entities that provided the DIP financing, Bridge loan, Exit Facility Loan.


Your Honor, after the October 29th hearing, during my investigations, I found the following 2 page document that was filed with the Federal Communications Commission on October 14, 2014.

This document demonstrates the connection, if not common ownership, between the preferred shareholders which ended up owning the new TSC, and the DIP Financing, Bridge Loan Lenders, and Exit Facility Loan Lenders.

Your Honor, if you would please review the document, It reveals the various masks utilized by the preferred shareholders to make It appear that the relationships among TSC, the Preferred Shareholders, and the DIP, Bridge Loan and Exit Facility Lenders have been and continue to be at arms-length.  In fact, they are all interconnected.

Your Honor, I believe that you have been deceived into believing that the preferred shareholders, Sola, Ltd., Highland Capital Management, West Face Opportunities, the DIP, Bridge Loan, and Exit Facility  Lenders are separate entitles.   They are not.

I wanted you to have this Information.  Thank you for your time and consideration •


Sincerely,

Patricia Madonna

Endosed: Exhibit 1-Form 175-Auction 97 2014 AWS Spectrum Bidco Corporation Consists of 2 pages:
  "Description of Indirect Ownership Interests and Affiliates of 2014 AWS Spectrum Bidco Corporation"

Exhibit 1
Form 175 –Auction 97
2014 AWS Spectrum Bidco Corporation
Page 1

## Description of Indirect Ownership Interests and Affiliates of
## 2014 AWS Spectrum BidcoCorporation

The Applicant, 2014 AWS Spectrum Bidco Corporation , is a Delaware corporation . John A. Dooley, a United States citizen, is the sole director and officer of Applicant. Applicant i s wholly owned and controlled by its sole stockholder, 2014 AWS Spectrum Partnership, LP, a Delaware limited partnership.

The General Partner of 2014 AWS Spectrum Partnership, LP, is Jarvinian AWS3 LLC, a Del aware limited liability company. Joh n A. Dooley is the sole member of Jarvinian AWS3 LLC. As the General Partner, Jarvinian AWS3 LLC h ol ds 100 percent of the voting interest in 2014 AWS Spectrum Partnership, LP, which i n turn controls Applicant. No other individual or entity holds any controlling interest i n Applicant. Jarvinian AWS3 LLC also holds a one percent equity interest i n 2014 AWS Spectrum Partnership, LP, and thus a one percent indirect interest in Applica t. As *sole* member of Jarvinian AWS3 LLC, John A. Dooley likewise holds a one percent indirect-ownershi p interest in Applicant.

The Limited Partner of 2014 AWS Spectrum Partnership, LP, is TerreStar Corporation, a Delaware corporation. As an insulated limited partner, TerreStar Corporation holds no voting or controlling interest i n 2014 AWS Spectrum Partnership, LP, n or i n Applicant. TerreStar Corporation holds 99 percent of the equity ownership of 2014 AWS Spectrum Partnership, LP.

Highland Crusader Offshore Partners, L.P., a Bermuda limited partnership. holds a 19.31 percent direct ownership interest in TerreStar Corporation, through which it holds a 19.12 percent indirect ownership in the equity of Applicant. Highland Crusader Fund II, Ltd., a Bermuda corporation, through its ownership of 77.17 percent of Highland Crusader Offshore Partners, L.P., holds a 14.9 percent indirect interest in TerreStar Corporation, and therefore holds a 14.75 percent indirect ownership interest i n the equity of Applicant.

Sola Ltd, a Cayman Islands exempted company, holds a 20.93 percent direct ownership interest i n TerreStar Corporation, through which i t holds a 20.72 percent indirect interest i n the equity of Applicant. Sola Intermediate Fund Ltd, a Cayman Islands exempted company, through its 57.05 percent ownership of Sola Ltd. holds an 1 1.94 percent indirect ownership interest in TerreStar Corporation, and therefore holds an 11.82 percent indirect ownership interest in the equity of Applicant.

West Face Long Term Opportunities Global Master L.P., a Cayman Islands limited partnership. holds a 31.04 percent direct ownership interest i n TerreStar Corporation, through which i t holds a 30.73 percent indirect interest i n the equity of Applicant. West Face Long Term Opportunities Fund (USA) Limited Partnership, a United States limited partnership, through its 34.7 percent ownership interest i n West Face Long Term Opportunities Global Master *L.P.*, holds a 10.77 percent indirect ownership interest in TerreStar Corporation, and therefore holds a

Exhibit I
Form 175 -Auction 97 2014
AWS Spectrum Bidco Corporation
Page 2

10.66 percent indirect ownership interest in the equity of Applicant. West Face Long Term Opportunities Master Fund L.P., a Cayman Islands limited partnership, through its 52.1 percent ownership interest in West Face Long Term Opportunities Global Master L.P., holds a 16.17 percent indirect ownership interest in TerreStar Corporation, through which it holds a 16.01 percent indirect ownership interest in the equity of Applicant. Intum, West Face Long Term Opportunities Fund Ltd., a Cayman Islands corporation, holds a 95.5 percent interest in West Face Long Term Opportunities Master Fund L.P., which equals a 15.44 percent indirect ownership interest in TerreStar Corporation and a 15.29 percent indirect ownership interest in the equity of Applicant.

Under the FCC's designated entity rules, 47 C.F.R. § 1.2110(c)(5), Applicant is affiliated with three additional entities through its director and officer, John A. Dooley, who is the sole member of Jarvinian LLC (which sometimes does business as Jarvinian Wireless Innovation Fund or Jarvinian Ventures), Jarvinian Advisors LLC, and Nanoton LLC.  None of these affiliated entities holds any equitable or controlling interests in the Applicant. Revenue information for each of these affiliates has been included on Applicant's Form 175. Personal income information for Mr. Dooley has not been included, pursuant to the FCC's instruction that it will not attribute to Applicant the personal net worth, including personal income, of its officers and directors.

### III. The Wheeler-Dealing which spearheaded the Defrauding of TSC's Assets which resulted in Innocent Minority Common Shareholders being taken for a ride.

This entire Chapter 11 case, starting from the pre-petition planning and going through the alleged 'substantial consummation' was poisoned by a series of events and transactions solely designed to place all of TSC's valuable assets (as well as the assets of TSN, a subsidiary for which TSC is a 89.3% majority shareholder) in the possession of TSC's insiders and control parties, such as the Preferred Shareholders and their own affiliates and controlling shareholders.

There is no doubt that this plan and the execution of this plan was carefully crafted. There is also no doubt that this plan was successful since now all of the assets owned by TSC over the last several years (and those owned by TSC's wholly owned subsidiary, TSN) are currently owned by insiders, control parties or former insiders of TSC. Let's face it, their bankruptcy scheme worked. Now that they have completed their scheme, they are using the very fact that they have achieved their goal -- or, at least that their scheme has been 'substantially consummated' -- as a means to avoid further judicial scrutiny. This is not an equitable result. This is certainly not the type of 'equity' that the doctrine of 'equitable mootness' was intended to protect.

Moreover, while it goes without saying that a debtor-in-possession, like TSC, should be maximizing the value and recovery for the benefit of its creditors and equity holders, here, TSC's Third Amended Joint Plan was designed solely to maximize the recovery for the Preferred Shareholders and TSC's insiders. In fact, TSC, as a debtor-in-possession, was a fiduciary having the same fiduciary obligation of a Chapter 11 trustee to the estate and its creditors and TSC's shareholders. *See Temp-Way Corp. v. Continental Bank*, 95 B.R. 343 (Bkrtcy. E.D.Pa. 1989); *In re American Bantam Car Co*, 193 F.2d 616 (3d Cir. 1952). TSC, therefore, had an affirmative obligation to fully disclose the identity of its "insider" or "control persons" and their pivotal role in the transactions involving TSC's assets and their valuation.

The Third Amended Joint Plan had absolutely no provisions to investigate and pursue the recovery of the fraudulently transferred assets of TSC. TSC miserably failed to disclose its insiders and control persons and the instrumental role each played in driving TSC into bankruptcy, controlling the timing of the bankruptcy filings, and the conflict of interest transactions, pre-filing and during the bankruptcy proceedings, which substantially undervalued TSC's assets. This critical material plan omission

also was not given its proper consideration by this Court in reviewing the
Confirmation Order.

Below, Plaintiff summarizes some of the details of the facts and data which were
overlooked and, if considered, would alter this Court's conclusion that this motion is
considered equitably moot due to the FRAUD ON THE COURT. This court's ruling
if moot is improper...due to fraud on the court...fraudulent conveyance and non bona
fide sale of assets by insiders (pre and/or post) petition

## A. The 1.4 GHz Spectrum License

As stated above, while the 1.4 GHz Spectrum License is the asset primarily addressed
in this Court's August 16, 2013 Order, it is not the only asset/former asset of TSC
which should have been considered and valued by the Bankruptcy Court in
proceeding to confirm TSC's Third Amended Joint Plan of Reorganization. Plaintiff
will address this asset first since its history is the clearest indication of the value
manipulation (or under-valuation) which occurred here.

As will be shown below, the 1.4 GHz Spectrum was assigned one value to justify the
issuance of tens of millions of shares to insider Harbinger and to also give Harbinger
control of TSC. Later, these same parties caused TSC to value this same asset for
hundreds of millions of dollars less so that it could obtain confirmation of a Chapter
11 Plan which eliminated the interests of TSC's common shareholders and provided
the Preferred Series A (comprised of Highland) and Series B shareholders (comprised
of Harbinger and Solus) with sole ownership of TSC and the 1.4 GHz Spectrum
License.

This Court gave singular consideration to the value of the 1.4 GHz Spectrum License
in determining that it did not make sense to unwind the Third Amended Joint Plan as
this Court found that there was no basis to find value sufficient to allow recovery to
the common shareholders. *See* Memorandum Decision and Order, DE 22, p. 8. As
detailed below, although Plaintiff did not have the financial resources to hire his own
valuation expert (TSC cleverly eliminated the opposition of any objecting party (like,
Elektrobit) with the financial resources to retain an expert and obtain a proper
valuation).

The 1.4 GHz Spectrum License (and all rights related thereto) was acquired in early 2008 by TSC from Harbinger and EchoStar Corporation. A copy of TSC's Schedule 14C, which was filed by TSC with the Securities and Exchange Commission on May 19, 2008, is attached hereto as Exhibit "C." Prior to TSC's acquisition of the 1.4 GHz Spectrum License, the seller, Harbinger, also was a significant controlling shareholder of the purchaser, TSC. In fact, at the time that Harbinger transferred its interest to TSC, Harbinger owned 41.1% of TSC's outstanding common shares. *See* Exhibit "A," at p. 15. To acquire the 1.4 GHz Spectrum License, TSC, among other things, issued between $50 million and $75 million of exchangeable notes to EchoStar, between $50 million and $75 million of exchangeable notes to Harbinger, issued to EchoStar the one and only share of Preferred Series C Stock and issued to Harbinger the one and only share of Preferred Series D Stock.[1]

The transaction also gave Harbinger and EchoStar certain rights to elect members of the Board of Directors of TSC. The notes given by TSC were exchangeable for tens of millions of common shares. In fact, by virtue of these exchangeable notes, TSC had to increase the amount of its issued shares. Upon completion of TSC's power-restructuring, Harbinger became the beneficial owner of 42.9% of TSC's outstanding common stock and EchoStar became the beneficial owner of 22.2% of TSC's outstanding common stock. Since this was a text-book insider transaction of far-reaching significance to TSC, Harbinger, EchoStar and TSC had to seek a third-party to review the transaction and state whether it was 'fair' to TSC. This is where Jefferies & Company comes in. Jefferies & Company was paid a fee of $1 million to review the transaction and determine whether it was fair to TSC. In doing so, Jefferies & Company had to value the 1.4 GHz Spectrum License. Upon its review of all factors and a thorough million-dollar investigation, Jefferies & Company projected low, median and high values for the 1.4 GHz Spectrum License of $533.4 million, $670.3 million and $856.2 million, respectively.

---

[1] The issuance of the shares of Preferred Series C and Series D shares is important because it also gave Harbinger and EchoStar consent rights for, among other things, certain sales of assets, making any material change in the line of business of TSC, amending or permitting the amendment of the certificate of incorporation, by-laws or other organizational documents, etc. *See* TSC's Certificate Of Designations Of Series E Junior Participating Preferred Stock, Series C Preferred Stock And Series D Preferred Stock Of Terrestar Corporation, dated February 7, 2008, attached hereto as Exhibit "D".

Thus, Jefferies & Company issued a February 2008 'fairness opinion,' incorporated in TSC's 14C, stating that this insider transaction, which gave Harbinger overwhelming control of TSC and further diluted the interests of the average common shareholder was, in fact, a fair transaction. TSC also required this 'fairness opinion' because it was not allowing the average common shareholders to vote on whether to approve the transaction because Harbinger -- entering the transaction -- controlled enough votes to obtain shareholder approval 'upon consent' and without a formal meeting and without having to seek a formal vote of all shareholders. All of this information is set forth in TSC's 14C attached hereto as Exhibit "C."

The transaction for which the Jefferies & Company 'fairness opinion' was utilized effectuated a complete overhaul of the power structure of TSC. Without this 'fairness opinion,' the 1.4 GHz Spectrum License would not have been sold to TSC and Harbinger would not have had the same degree of control over TSC. The Jefferies & Company 'fairness opinion' – which TSC and Harbinger now attempt to minimize -- even at the low end of the valuation, results in a sale potential of the 1.4 GHz Spectrum License which would yield a significant distribution to TSC's common shareholders. As further demonstration of TSC's manipulation and undervaluation of the 1.4 GHz Spectrum License. Plaintiff through numerous attempts has pointed out that, in December of 2008, TSC itself valued the 1.4 GHz Spectrum License at $359,013,000 and, in December of 2009, TSC valued the 1.4 GHz Spectrum at $362,304,000. [DE 179, DE 207, DE 232 and DE 253 from the underlying Bankruptcy Case]. In its Disclosure Statement, however, prepared at a time when TSC's controlling parties needed to assign the lowest value to its assets to justify wiping out the interests of TSC's common shareholders, TSC only assigned a value of $177 million to the 1.4 GHz Spectrum License. [DE 152 from the underlying Bankruptcy Case].

As set forth in in all of Plaintiff's Briefs, creditors, most notably Elektrobit, started to become suspect of this undervaluation and began to contest TSC's actions and began an investigation into TSC's actions of TSC and into the actions of its controlling parties. To eliminate any formidable opposition, TSC paid Elektrobit $13.5 million to neutralize any inquiry or investigation. TSC waited until Elektrobit was neutralized to introduce a brand new reason why the 1.4 GHz Spectrum License should be valued so low: it has limited use. To support this theory, TSC hired RKF Engineering. Mr. Zelin was later able to use RKF Engineering's 'limited use' conclusions to support

his own $160 million to $235 million undervaluation of the 1.4 GHz Spectrum License.

It was not at all coincidental that RKF Engineering was hired to provide this opinion only months before the confirmation hearing even though this bankruptcy case had been pending for approximately eighteen (18) months. *See* DE 630 from the underlying Bankruptcy Case. The timing of the hiring of RKF Engineering should not be minimized. RKF Engineering was hired at that time since TSC (and its controlling parties) knew that they had neutralized any party who had the financial resources to obtain a proper valuation of the 1.4 GHz Spectrum License and TSC also knew that it had successfully challenged the appointment of an independent examiner

to obtain a proper and unbiased valuation. TSC also knew that the common shareholders (like Plaintiff) did not have the financial resources to obtain their own valuation of this asset. In sum, the recent history of the 1.4 GHz Spectrum License shows that, at a time when TSC and its controlling parties needed a high value to support a 'fairness opinion' which allowed them to obtain further control of the ownership and governance of TSC, they paid Jefferies & Company a million dollar fee for this opinion. Then, shortly before confirmation of a Plan designed to eliminate TSC's common shareholders so that the control parties now have both complete control and complete ownership, TSC hired new experts to opine that the 1.4 GHz Spectrum License has limited use and, thus, has limited value. TSC's 'new' experts, Mr. Zelin and RKF Engineering, dispensed with the values provided under the Jefferies & Company opinion because it no longer suited the goals of TSC's controlling parties. In light of this history of value manipulation (and without question dramatic reduction in value) there should be no question that the only fair and equitable result would be to have the 1.4 GHz Spectrum License independently valued rather than simply accept TSC's manipulated under-valuation which the plaintiff and other common shareholders do not have the resources to contest.

- **The Blind Sided FLEECING of the 1.4 GHZ Spectrum License (as provided by Clayton Call to the Securities Exchange Commission on Aug 7, 2014 Exhibits E-F-G-& H**

- ---------- Forwarded message ----------
  From: **Clay Call** <pianorules1@gmail.com>
  Date: Thu, Aug 7, 2014 at 9:45 PM
  Subject: Terrestar Corp 11-10612(SHL) Dissipation of Assets-security violations
  To: "Masel, Scott A." <masels@sec.gov>
  Cc: juancarlos.zorrilla@hklaw.com, Juan Zorrilla <jcz@zgolaw.com>, Dan Pacaud
  <danpacaud@msn.com>, aper944951@aol.com, sandeep singh
  <sandy.s157@gmail.com>, rmhfab@juno.com, Sherry Call <call55462@gmail.com>

- Hello Mr Masel
- I hope you have been doing fine
- My name is Clayton Call and I have spoke to you several times via email and once or twice over the phone
- Before I start, I would like to thank you for the time that you have given me
- 
- A couple weeks ago I was reading documents on the SEC web site and I need to make you aware of what I found
- 
- In September of 2009, Terrestar Corporation (TSC) formed two holding companies. One is called Terrestar Holdings and the other is called Terrestar 1.4 Holdings. See attachment number 1 (Terrestar Holdings Formation) - this document is from the SEC website as shown on page 1. On page 2 , Notice how it states that Terrestar 1.4 Holdings  holds the FCC Licenses for 1.4 GHZ Spectrum and is controlled by Harbinger.
- 
- Now if you look at attachment number 2 (Certificate of Formation) -It shows the Official Certificate of formation for Terrestar 1.4 Holdings that was signed after hours, and if you look on page three it states specifically that "the Terrestar 1.4 Holdings purpose is aquiring, owming, holding, selling , leasing,  financing, refinancing, TRANSFERING, exchanging, operating and managing those certain 1.4 Licenses CURRENTLY OWNED BY TERRESTAR CORP (TSC) "
- 
- Mr Masel- they transferred our 1.4 Spectrum which the commons shareholders own to Terrestar 1.4 Holdings
- We werent aware of this , we werent notified, we didnt get to vote, -in fact I just uncovered  this a couple weeks ago.
- The 1.4 GHZ is worth between 10 and 15 BILLION dollars. They transferred the 1.4 spectrum to Terrestar 1.4 Holdings and then took our company and filed for bankruptcy. On top of that, this document is from a 86 page long CT order in which I found this in the middle of the document. Its like they were hiding it in a ct order and then additionally hiding in the middle of a 86 page document .
- 
- Now if you look at attachment number three entitled transfer of 1.4 spectrum, (from the SEC website) it clearly states -and I quote- "TSC has caused the formation of Terrestar 1.4 Holdings to which TSC has transferred its 1.4 GHZ Spectrum"
- and if that isnt bad enough, the next paragraph, they are going to issue 2 classes of prefered stock in the spectrum that they stole from us. (another violation) Again, we were totally unaware of this, we didnt get to vote on the formation of the holding companies, we didnt get to vote on the transferring of our assets, it was well hidden from us in the middle of a 86 page CT order.
- Correct me if I am wrong, but our statute of limitations for this would start as of a couple weeks ago when I uncovered this.
- 
- Dissipation of assets is a SEC violation. I have read many of press releases from the SEC about fines levied and criminal action taken for dissipation of assets- to give you one example- of many- SEC vs Leon Levy- in which I believe you were in charge of the

- case in 2004.
- 
- This is one of the reasons ALdo wanted to meet with you, so he could show you first hand this information.  However he still has additional SEC violations that he needs to show you, which is why he would still like to meet with you.
- 
- Again I want to thank you for your time and respectfully request the 1.4 Spectrum be returned to the common share holders immediately.
- 
- With the utmost of respect towards you
- Please take care
- 
- Clayton Call

## B. The 1.6 GHz Spectrum License

In addition to the value manipulation or under-valuation which occurred regarding the 1.4 GHz Spectrum License, this Court may have overlooked the fact that significant assets both within one year of TSC's bankruptcy, in the case of the 1.6 GHz Spectrum License, and during TSC's and TSN's bankruptcy, in the case of the 2.0 GHz Spectrum License, were transferred from TSC (or its subsidiary, TSN) for a fraction of the actual value of the assets. These transfers were to insiders and/or controlling parties of TSC. Even though these transfers contributed to TSC's insolvency, they were never scrutinized by a third-party and the Third Amended Joint Plan made no provisions to review these transactions and/or to seek the recovery of the assets/value for the benefit of TSC. One of these insider transactions involves the 1.6 GHz Spectrum License and the non-scrutiny of the conflict of interest fraudulent transfer of this asset which occurred on March 29, 2010 (less than one year before TSC's bankruptcy filing). On this date, TSC transferred its 42% interest in Skyterra Corporation (the owner of the 1.6 GHz Spectrum) to its insider preferred shareholder, Harbinger (and its hedge-fund manager, Philip Falcone), for substantially below its fair market value. [DE 660 from the underlying Bankruptcy Case, p. 29]. TSC first acquired 100% of Skyterra Corporation ("Skyterra") from Philip Falcone sometime in 2006. Falcone was both a controlling shareholder of TSC at the time of TSC's acquisition of Skyterra and also a controlling shareholder of TSC's preferred shareholder, Harbinger. *See* Exh C and D, Skyterra's March 29, 2010 Schedule 13D. Skyterra's sole asset was the 1.6 GHz Spectrum License, which was being valued in 2008 for $1.62 billion on the low end

and as high as $3.00 billion. *See* Exhibits I and J, attached hereto. TSC, in its
consolidated financial statements for 2007, 2008, 2009, and 2010, failed to
disclose the 1.6 GHz Spectrum License as one of its assets or its value. [DE 660 from
the underlying Bankruptcy Case, pp. 21-23]. On March 29, 2010, less than one year
before TSC's Chapter 11 bankruptcy filing, TSC sold its equity interest in Skyterra
for $262.50 million (approximately 10 times less than its estimated value in 2008) to
insider Harbinger and its hedgefund manager, Philip Falcone, which at the time had a
controlling interest in TSC. *See* TSC's 14C, attached hereto as Exhibit "C." *See also*
Exhibit "I ," Skyterra's March 29, 2010 Schedule 13D

Plaintiff on numerous motions, and letters has brought this dramatic price reduction
and sale to an insider of TSC (which occurred less than one year before TSC's
bankruptcy filing) to the Bankruptcy Court's attention and Plaintiff sought an
examiner to investigate the transfer as a potential recovery action. TSC, however,
successfully blocked further investigation by concealing from the Bankruptcy Court
the true value of the 1.6 GHz Spectrum License. As it turns out, the 1.6 GHz
Spectrum License was ultimately placed back into the hands and control of hedge-
fund manager Philip Falcone, who changed the name of Skyterra to LightSquared and
created a new competitor to compete against TSC at a time when Falcone was a
majority common shareholder and control party for one of TSC's controlling
preferred shareholders. (See Exhibit L)

The value assigned by TSC to the 1.6 GHz Spectrum License was also manipulated.
While TSC reported that the value of the transaction was $262.50 million, Skyterra
reported the transaction as having a value of $1.849 billion. *See* Exhibit "J." As
recent events reveal, TSC substantially misrepresented the value of the 1.6GHz
Spectrum to the Bankruptcy Court and LightSquared's valuation of this spectrum at
$1.849 billion was accurate. LightSquared (formerly Skyterra) itself filed bankruptcy
in 2012. As further support for the undervaluation of the 1.6 GHz Spectrum License,
EchoStar's principal, Charles Ergen, another TSC insider, was offering $2.2 billion
for the 1.6GHz Spectrum License. *See* http://www.bloomberg.com/news/2013-05-
21/ergen-said-to-offer-2-billion-for-lightsquared lightsquaredfrequencies-
2-.html and http://www.bloomberg.com/news/2013-08-29/lightsquared-shouldn-trun-
its-own-auction-lenders-say.html.

In sum, TSC transferred an asset to an insider within a year prior to bankruptcy for
$262.50 million. This asset, the 1.6GHz Spectrum License, was reported by Skyterra
to be worth $1.849 billion. If the Third Amended Joint Plan had included a

provision for the investigation of the 'sale' and the recovery value of the transfer, a recovery action could have been brought against Harbinger and could have resulted in payment in full to all of TSC's creditors and common equity owners. Such a provision, however, was glaringly absent because Harbinger was one of the parties controlling this bankruptcy proceeding and it would have been against Harbinger's self-interest to do so. It was, therefore, improper to confirm the Third Amended Joint Plan without a provision to investigate or pursue transactions, such as this one, as well as other potential preference or fraudulent transfer actions.

**C. Ergen's Insider Transactions Related to the Sale of the 2.0 GHz Spectrum License and the TS-1 and TS-2 Satellites.**

In addition to the foregoing, TSC's subsidiary, TSN, auctioned and sold assets, including the 2.0 GHz Spectrum License, at a substantially reduced price to EchoStar Corporation, a company that was owned by Charles Ergen, one of TSC's majority shareholders (owning 30 million shares) prior to TSC's bankruptcy filing. *See* Exhibit "K." The 2.0 GHz Spectrum License was, at the time, independently valued to be worth no less than $4.7 billion. [DE 386 from the underlying Bankruptcy Case, p. 24]. Previously, on June 30, 2005, a telecommunications analyst from UBS ag Bank valued the 2.0 GHz Spectrum License at $9.8 billion. [DE 179 from the underlying Bankruptcy Case, p. 104].

Notwithstanding these values, TSN auctioned and sold the 2.0 GHz Spectrum License, along with two satellites, the TS-1 and the TS-2 satellites, to Charles Ergen's company, EchoStar (also an insider of TSC with substantial holdings in TSC), for only $1.375 billion. [DE 607 from the underlying Bankruptcy Case, p. 24]. According to TSC's 2010 financial statements, the TS-1 and the TS-2 satellites alone had a value of $500 million each. [DE 607 from the underlying Bankruptcy Case, p. 24]. Charles Ergen also was a majority shareholder of TSC shortly before TSC's Chapter 11 case was filed. The assets were sold at a deflated price to fraudulently misrepresent that there was not enough money to distribute to TSN's and TSC's common shareholders.

The "auction" of the 2.0 GHz Spectrum License to insider EchoStar was another transaction which should have been investigated if the Third Amended Joint Plan was actually designed -- as it should have been -- to maximize recovery to TSC's estate. Instead, these transactions, involving insiders and control parties of TSC, were overlooked by the Plan and, respectfully, may have been overlooked by this Court (or not given its due weight) in finding that the Second Amended Complaint of the Plaintiff Aldo Ismael Perez is equitably moot and ordering the dismissal of this Second Amended Complaint of the Plaintiff Aldo Ismael Perez. The lack of the bona-fides of the auction, if properly investigated, would have, taken alone or in conjunction with TSC's other assets (i.e., the 1.4 GHz Spectrum License and the 1.6 GHz Spectrum License), yieldedsignificant recovery value to TSC sufficient to afford monetary recovery to TSC's common shareholders under a proper plan of reorganization.

### IV. Plaintiff and the Common Shareholders Never Stood a Chance Against the Preferred Shareholders Who Had Control of TSC's Spending

This Court concluded that it cannot order effective relief to Plaintiff based upon the assumption that both the Zelin valuation and the RKF report regarding the limitations on the 1.4Ghz Spectrum License are acceptable and accurate. However, without the appointment of an independent examiner, these conclusions are simply accepted by default since Plaintiff and the other similarly situated common shareholders did not have the financial wherewithal (nor did they have sufficient time) to retain experts to challenge the experts hired by the Preferred Shareholders with TSC's funds[2].

---

[2] Even Zelin himself, when testifying in TSN's bankruptcy case, admitted that Charles Ergen (of EchoStar) and Philip Falcone (of Harbinger) -- who are the direct or indirect beneficiaries of these multiple fraudulent/insider transfers -- were TSC's "Black Marbles" that controlled TSC. *See* DE 206, at p. 117-119 in TSN's Bankruptcy case.

Thus, to conclude that this Court cannot order effective relief since there is no evidence that there were assets or recoverable transfers in excess of $515 million is the equivalent of putting the proverbial cart before the horse.

In light of all of the evidence of improper conduct by the insiders and control parties of TSC, it cannot be fairly concluded that an independent examiner and/or independent valuation expert would not have valued the 1.4 GHz Spectrum License and the recovery value of the fraudulently transferred 1.6 GHz Spectrum License and 2.0 GHz Spectrum License for an amount in excess of $515 million. Moreover, the notion that Plaintiff (or any of TSC's common shareholders) had been given a fair opportunity to contest the actions taken by TSC at the behest of the Preferred Shareholders is not a fair nor accurate assumption. Plaintiff has appeared *pro se* throughout most of the proceedings. However, when he attempted to submit a PowerPoint presentation [DE 331 in the underlying Bankruptcy Case] which detailed the insider transactions noted herein and in his Plaintiff *(pro se)* Briefs, the PowerPoint presentation was never accepted or considered by the Bankruptcy Court. By the January 10, 2012 hearing to consider TSC's Disclosure Statement, the Bankruptcy Court had not reviewed the PowerPoint Presentation. *See* DE 365 from the underlying Bankruptcy Case, at ¶ pp. 37 - 45. After hearing Plaintiff's plea to consider the PowerPoint Presentation, which set forth the conflict of interest transactions which are the gravamen of all of Plaintiff's motions, the Bankruptcy Court took a short recess to review Plaintiff's PowerPoint Presentation. When The Court returned, he denied the evidence/submission and would not consider it as an objection since he found it to be untimely. *See* DE 365 from the underlying Bankruptcy Case, at ¶ p. 46. However, the Bankruptcy Court stated that it would consider this information at the Confirmation Hearing. *See* DE 365 from the underlying Bankruptcy Case, at p. 47. As the transcript of the confirmation hearing reveals, however, the Bankruptcy Court hurried Plaintiff *(pro se)* and another objecting shareholder (Mr. Swartz) make their presentations and/or to examine Mr. Zelin. *See* DE 675 from the underlying Bankruptcy Case. In fact, Plaintiff felt so pressured by the Bankruptcy Court's admonitions, that he only asked one question of Mr. Zelin. Plaintiff, *(pro se)* was, therefore, not provided a fair opportunity to cross-examine or present his case and, thus, the value of the 1.4 GHz Spectrum License was determined 'by default.' The insider transactions involving the 1.6 GHz Spectrum License and the 2.0 GHz Spectrum License went by the wayside.

### V. Plaintiff's Previous Stay Requests Were All Denied — Requesting
### A Stay of the Confirmation Order Would Have Been A Futile Act

The crux of this Court's finding of equitable mootness was based upon its perceived inability to order effective relief. Because this Court also noted that Plaintiff did not seek a stay of the Confirmation Order, Plaintiff would be remiss in not addressing this issue. All of Plaintiff's previous stay requests pertaining to the Bankruptcy Court's denials of the relief he sought -- which was always to investigate the undervaluation of TSC's assets and the insider transactions -- were denied. *See, i.e.,* DE 442, 752, 765 from the underlying Bankruptcy Case. The stay requests of other shareholders were similarly denied. Consequently, requesting a stay of the Confirmation Order from the Bankruptcy Court would have been 'dead on arrival.' Just recently, one other equity holder requested a stay, of course it was also denied. DE 788 from the underlying Bankruptcy Case.

The failure to make a request whose fate was known should be a *de minimus* consideration in deciding the applicability of the equitable mootness doctrine. If the application of the equitable mootness doctrine would hinge on what we all know would be a futile act, justice would be turned on its head.

**Defendants/Debtors are not entitled to seek sanction behind the equitable mootness doctrine.**

**The equitable mootness doctrine is not a "Get out of Jail Free Card", Fraud on the Court does not fall under the equitable mootness doctrine umbrella.**

**The outline and history of this case, clearly demonstrates and expresses that "FRAUD ON THE COURT" has been perpetrated. These actions confirmed the Confirmation of the Plan, therefore the Confirmation Plan was procured through FRAUD.**

## VI. Conclusion

In the years leading up to this bankruptcy case, the controlling parties/insiders/preferred shareholders of TSC were able to reward themselves and receive the assets of TSC at substantially below fair market values. When TSC was left with only one asset, the 1.4 GHz Spectrum License, these same parties were able to essentially privatize TSC, effectuate the elimination of the average common shareholders so that the Preferred Series A and Series B shareholders ended up owning TSC, but not pay anything to obtain all of TSC's common shares.

These parties were able to accomplish their scheme by substantially undervaluing the 1.4 GHz Spectrum License so that it appeared that there was simply not enough value to pay creditors and the former common shareholders. Then, after they paid off any formidable objecting party with the means to contest their scheme, these controlling parties/insiders/preferred shareholders quickly consummated the transactions necessary to hide behind the doctrine of 'equitable mootness'. This Court should not allow TSC's controlling parties/insiders/preferred shareholders to use this equitable doctrine to accomplish an inequitable result. It is respectfully submitted that, in finding that Plaintiff could not establish the five *Chateaugay* factors, this Court overlooked and/or substantially discounted the purpose behind the 'equitable mootness doctrine' and also overlooked the fact that the 1.4 GHz Spectrum License was not the only asset/potential asset whose recovery could completely change the outcome of this Chapter 11 case. Finally, this Court could still fashion a relief which would -- even after substantial consummation – provide effective relief to Plaintiff and the other similarly situated common shareholders. Accordingly, Plaintiff respectfully requests that this Court reconsider its dismissal of this Second Amended Complaint as equitably moot and, instead, consider the Second Amended Complaint on its merits.

## VII. Effective Relief May Still Be Ordered By this
## Court without Creating a Chaotic Situation

It appears that a major issue which caused this Court to find the Second Amended
Complaint is equitably moot was a perceived inability to order effective relief
without unraveling intricate transactions and creating an unmanageable,
uncontrollable situation for the Bankruptcy Court. However, and especially in light of
the fact that most of the transactions which need to be 'unraveled' do not involve
innocent third-party transactions, effective relief is still possible.

For example, if an independent examiner that is mutually agreed upon for upholding
fairness and transparency is appointed at this point in time to value the 1.4 GHz
Spectrum License.  Knowing it is more than the value assigned by Zelin -- the
Preferred Shareholders could be required to create a fund which will be available for
distribution to creditors who have not been paid in full and to the common
shareholders (who, on March 7, 2013, had their shares cancelled).
Similarly, with regard to the 1.6 GHz Spectrum License and the 2.0 GHz Spectrum
License (as well as the two satellites sold with the 2.0 GHz Spectrum License), the
transfer of these assets could be investigated and the assets re-valued. These
valuations can be obtained without upsetting any of the distributions made under the
Third Amended Joint Plan. If, the insiders/control parties who received those assets
did not pay fair value for these assets, this money could also be recovered and paid
into a fund to pay TSC's creditors and common shareholders. This relief would
require parties (here, insiders and control parties of TSC) to have to pay the true
value of what they received without causing an unmanageable or uncontrollable
situation. Consequently, the relief this Court can fashion will prevent the parties who
controlled this bankruptcy scheme to retain the spoils of their insider transactions.

## VIII.  The Standard for a Motion for Reconsideration

The standard for a motion for reconsideration in this District was recently well-summarized (with supporting case law) as follows:

Local Civil Rule 6.3 allows parties to file motions for reconsideration regarding "matters or controlling decisions which Plaintiff pro se believes the court has overlooked." "The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.' " *Lupo v. Comm'r of Social Sec.,* No. 07 CV 4660, 2011 WL 2036448, at *1 (E.D.N.Y. May 24, 2011)   (quoting *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995)).

Generally, under Rule 6.3, courts have required that the movant "demonstrate controlling law or factual matters put before the court on the underlying motion that the movant believes the court overlooked and that might reasonably be expected to alter the court's decision." *Ferrand v. Credit Lyonnais,* 292 F.Supp.2d 518, 520 (S.D.N.Y.2003) (internal citations omitted); *see also Byrne v. Liquid Asphalt Sys., Inc.,* 250 F.Supp.2d 84, 88 (E.D.N.Y.2003).

   *Haggard Intern. Corp. v. United Co. for Food Industry Corp.,* 2013 WL 3356953 (E.D.N.Y., 2013).

Dated: October 12, 2015

                                                          Respectfully Submitted,

                                                          Aldo Ismael Perez
                                                          Plaintiff (*pro se*)

## CERTIFICATE OF SERVICE

I certify that on October 12, 2015, I mailed via Federal Express and have filed the foregoing document with the Clerk of the Court for the Southern District of New York.  I will also send a notice of electronic email to all counsel or parties who are not authorized to receive electronically Notices of Electronic Filing including:

**Ira S. Dizengoff , Esq.**
Akin Gump Strauss Hauer & Feld LLP (NYC)
One Bryant Park
New York, NY 10036
Email: idzengoff@akingump.com

A copy was also served via e-mail to

**Sarah Link Schultz, Esq.** sschultz@akingump.com
Akin, Gump, Strauss, Hauer & Feld, LLP
1700 Pacific Avenue Suite 4100
Dallas, Texas 75201
E-mail: sschultz@akingump.com

*/s/ Aldo Ismael Perez,  Plaintiff (pro se).*
**Aldo Ismael Perez,** *Plaintiff (pro se)*